## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

TULSA ATHLETICS, LLC,               )
                                    )
            Plaintiff,              )
                                    )
v.                                  )          Case No. 24-CV-0194-CVE-SH
                                    )
NATIONAL PREMIER SOCCER             )
LEAGUE, INC., CINDY SPERA, and      )
KENNETH FARRELL,                    )
                                    )
            Defendants.             )

## <u>OPINION AND ORDER</u>

Before the Court are defendants[1] National Premier Soccer League, Inc. ("NPSL") and Cindy Spera's[2] motion for judgment on the pleadings (Dkt. # 34), defendants' motion for summary judgment (Dkt. # 50), and plaintiff's motion for partial summary judgment (Dkt. # 51). The parties have filed their respective responses and replies, and the motions are now ripe for review. The Court grants defendants' motion for summary judgment (Dkt. # 50), denies plaintiff's motion for partial summary judgment (Dkt. # 51), and finds that defendants' motion for judgment on the pleadings (Dkt. # 34) is moot.

---

[1]     As plaintiff has not served Kenneth Farrell (Dkt. # 50, at 7), the Court will refer to the NPSL and Spera collectively as "defendants."

[2]     Plaintiff sues Spera, NPSL's managing director, and Farrell, a member of NPSL's board of directors, in their individual and official capacities. Dkt. # 2-1, at 5; Dkt. # 50-2, at 1.

# I.

This case arises out of defendants' allegedly wrongful finding that plaintiff's venue, Athletic Field,[3] did not meet defendants' minimum venue standards for the 2022 playoffs, 2023 season, and 2024 season. The undisputed material facts in the summary judgment record are as follows:[4]

Tulsa Athletics, LLC, is a soccer club based in Tulsa, Oklahoma. Dkt. # 50, at 10; Dkt. # 51, at 5; Dkt. # 56, at 9. The members of the LLC—Sonny Dalesandro, Dr. Thomas ("Tommy") Kern, and Alfred Mockett—are citizens of Oklahoma, and Dalesandro refers to himself and Dr. Kern as a co-owners of the club. Dkt. # 25, at 1-2; Dkt. # 51-1, at 1, 4. In 2013, plaintiff joined the NPSL—a United States Adult Soccer Association ("USASA")[5] member and USASA rated Tier 1 men's amateur soccer league. Dkt. # 50, at 8, 10; Dkt. # 50-2, at 1; Dkt. # 56, at 6, 9. The NPSL is incorporated in Delaware with its principal place of business located in New York. Dkt. # 24, at 1. Spera, the NPSL's managing director, and other unidentified NPSL staff members interpret and

---

[3]    Within the record, plaintiff's venue is referred to as Hicks Park, Athletic Field, and Athletic Stadium. For the sake of clarity, the Court will refer to plaintiff's venue using its official name, "Athletic Field." See Dkt. # 51-1, at 2.

[4]    The Court supplemented the undisputed material facts listed in the parties' summary judgment briefings with evidence from the summary judgment record to provide a more comprehensive overview of the procedural and factual background and relevant documents for the purposes of the underlying legal analysis.

Further, the Court finds it necessary to remind the parties that, "[e]ven though all doubts must be resolved in [the non-movant's] favor, allegations alone will not defeat summary judgment." Cone v. Longmont United Hosp. Ass'n, 14 F.3d 526, 530 (10th Cir. 1994). Therefore, the Court disregards the parties' unsupported allegations and "disputes" as to material facts and notes that a party cannot dispute a material fact by simply citing its own motion for summary judgment. See Dkt. # 56, at 7.

[5]    The USASA is a member of the United States Soccer Federation ("USSF" or "U.S. Soccer"). Dkt. # 50, at 8; Dkt. # 50-2, at 1; Dkt. # 56, at 6.

enforce the NPSL venue standards. Dkt. # 50, at 9; Dkt. # 50-1, at 5-6; Dkt. # 56, at 8; Dkt. # 56-1, at 10. However, the NPSL board may overrule Spera and the NPSL staff's venue decisions. Dkt. # 50, at 9; Dkt. # 56, at 8; Dkt. # 56-1, at 10.

In 2013, the NPSL introduced its bylaws (Dkt. # 50-3) and adopted and amended its policies ("2013 policies") (Dkt # 51-2). The 2013 policies "exist in conjunction with the [b]ylaws . . .[,]" and require the following minimum standards for facilities:

> (a) Stadium to seat five hundred (500) people.
> (b) Dressing [r]oom with showers for each team.
> (c) Referees' changing room and showers.
> (d) Benches for both teams to accommodate 16 people.
> (e) Referee [t]able.
> (f) Playing field sixty-five by one hundred ten yards minimum.
> (g) Playing field eighty by one hundred twenty yards maximum.
> (h) Field markings according to standard regulations.
> (i) Water and ice at bench area for visiting team and referees.
> (j) United States [f]lag.
> (k) P A [s]ystem.
> (l) Electronic scoreboard with space for [h]ome/[v]isitor scores and working time clock.

Dkt. # 51-2, at 2, 15. The 2013 policies remained current through the 2016 season. Id. at 2.

From 2013 to 2016, plaintiff played its matches at a former minor league baseball stadium owned and operated by Tulsa County. Dkt. # 51, at 5; Dkt. # 51-1, at 2; Dkt. # 55, at 6. However, Tulsa County decided not to renew plaintiff's lease before the 2016 season.[6] Dkt. # 51-1, at 2. As a result, plaintiff played one season at Lafortune Stadium and, with the NPSL's permission, four

---

[6]    In plaintiff's motion for partial summary judgment, plaintiff cites to Dalesandro's declaration to support its characterization of the facts recited in this paragraph. Dkt. # 51, at 6. However, Dalesandro's declaration and plaintiff's motion differ in their recitation of the facts. Compare Dkt. # 51, at 6, with Dkt. # 51-1, at 2-3. The Court relies on Dalesandro's declaration, instead of plaintiff's unsupported allegations in its motion for partial summary judgment, in reciting these facts.

seasons at an unfenced, open park.  Id. at 2-3.  On an unspecified date, plaintiff began its search to identify a NPSL compliant venue, during which Dalesandro avers that it "paid close attention to the NPSL venue standards to ensure whatever venue [it] chose would be compliant."  Id. at 3.

Plaintiff selected Hicks Park, "an old baseball park . . . ."  Id.  Dalesandro avers that the park was completely enclosed by a chain link fence with a single entry for ticketing and included: an adjoining community center with locker rooms and showers for visiting teams and referees; stadium lights; a concession stand; permanent restrooms; and "plenty of space to accommodate the required field dimensions."  Id.  Dalesandro avers that plaintiff reconfigured the park "to ensure compliance with NPSL standards . . ." by: deconstructing the backstop; adding tiered bleachers for more than 500 fans; installing permanent railings to separate spectators from the field; and "constructing a series of shipping containers to serve as an elevated press box equipped with electrical connections and Wi-Fi."  Id.  With the city's permission, plaintiff rebranded the venue as "Athletic Community Field at Hicks Park" ("Athletic Field").  Id.

In February 2021, the NPSL updated its bylaws ("2021 bylaws").[7]  Dkt. # 50-7, at 1.  The 2021 bylaws do not set out minimum venue standards or reference the 2013 policies.  Section 3.01 of the bylaws requires the managing director to carry out the following duties:

A . Management of the league's day to day operations in the active and off season[;]
B. Enforcing the [l]eague rules;
C. Providing the platform for hearings for appeals and protests;
D. Encouraging growth in [l]eague membership; and,
E. Fostering goodwill among the greater community of US Soccer.

---

[7]     While the NPSL Historical Timeline provides that the NPSL updated its bylaws in 2020, not 2021 (Dkt. # 50-3), the Court relies on the 2021 bylaws, which expressly provide that they were updated in 2021 (Dkt. # 50-7).

Id. at 7-8. Further, § 13.01 provides that "[a]ll words, terms and provisions of these [b]ylaws shall be interpreted and defined by and in accordance with Delaware [l]aw." Id. at 25. The parties treat these bylaws as current.

In 2022, the NPSL allowed plaintiff to play its regular season at Athletic Field,[8] and Anheuser-Busch sponsored plaintiff for $10,000.[9] Dkt. # 50-4, at 12; Dkt. # 50-13, at 5; Dkt. # 50-21, at 1-2; Dkt. # 51-1, at 3-4; Dkt. # 56, at 14. In June 2022, plaintiff added to its venue a press box made of shipping containers. Dkt. # 50, at 12; Dkt. # 50-13, at 3; Dkt. # 50-15, at 1-3; Dkt. # 56, at 11. On July 15, 2022, the NPSL's director of operations and club services emailed the teams, including plaintiff, with instructions for the 2022 regional semifinal, regional final, and national semifinal games ("2022 playoffs") and requested that "[a]ll teams . . .  fill out the minimum standards checklist . . . [,]" which required the following list of venue attributes:

- Closed environment (no parks or open fields are permitted for these rounds)
- American Flag displayed and clearly visible from stands and field
- Stadium setting with seating for 500 spectators
- Field markings obvious and clear, and according to standard regulations
- Field dimensions in accordance with NPSL policy (65 x[ ]110 minimum, 80 x 120 maximum)
- Goal nets in good condition and corner flags not less than 5 feet high
- Minimum ONE locker room reserved for VISITING team

---

[8]    In plaintiff's response to defendants' motion, plaintiff disputes that the NPSL's approval of its venue "was limited in any way to the 'regular season' . . . ." Dkt. # 56, at 9. However, the evidence plaintiff cites in support of its assertion shows that the NPSL's authorization of Athletic Field pertained specifically to the 2022 regular season. See Dkt. # 51-1, at 3-4 ("The NPSL authorized us to play our 2022 regular season matches at Athletic Field . . . ."); Dkt. # 51-3 (providing that "[t]he requirements for these rounds of [the 2022] playoffs are higher than allowed up until this point."). Therefore, plaintiff fails to properly dispute the scope of the NPSL's authorization of Athletic Field for the 2022 season, and, no reasonable juror could infer that the scope of the NPSL's approval of Athletic Field exceeded the regular season.

[9]    The Anheuser-Busch sponsorship service order is dated February 4, 2022. Dkt. # 50-21.

- FOUR working, hot showers (visitors bring shower supplies and towels)
- Private referee changing area, showers not required.  Area cannot be shared with an NPSL team.
- Benches for each team to accommodate 16 people per team
- Operational electronic scoreboard with space for home/visitor scores and a working time clock
- Operational [p]ublic [a]ddress system[.][10]

Dkt. # 51-3, at 2, 3 (punctuation inconsistencies in original).

After plaintiff qualified for the 2022 playoffs on July 16, 2022, plaintiff submitted a form requesting approval of Athletic Field.  Dkt. # 50, at 11; Dkt. # 50-9, at 1; Dkt. # 56, at 10.  On July 18, 2022, the NPSL denied plaintiff's request because it found that plaintiff's venue lacked a stadium, and the NPSL informed plaintiff that its venue was not approved for the 2022 playoffs or the 2023 season.[11]  Dkt. # 50, at 11; Dkt. # 50-10, at 1; Dkt. # 56, at 10.  Nevertheless, the NPSL permitted plaintiff to play its regional semifinal game at Athletic Field.  Dkt. # 50-10, at 1.

On July 20, 2022, Dr. Kern sent an email asking "the board again for approval for hosting for all remaining rounds in the 2022 playoffs . . . along with feedback from the league for any specific needs for the venue, especially for the 2023 season."[12]  Dkt. # 50-11.  Adam Lewin, an individual who the Court infers is an NPSL board member, replied to the email and copied Spera,

---

[10]    Plaintiff characterizes this email as providing the 2022 venue standards.  Dkt. # 51, at 6-7. However, the email plainly states that "this memo applies to REGIONAL SEMIFINAL, REGIONAL FINAL, AND NATIONAL SEMIFINAL matches . . ." and that "[t]he requirements for these rounds of playoffs are higher than allowed up until this point."  Dkt. # 51-3, at 2 (emphasis in original).  Even viewing the evidence in the light most favorable to plaintiff, no reasonable juror could conclude that this email sets out the general 2022 venue standards.

[11]    While the NPSL denied Athletic Field as a venue, the NPSL admits that it occasionally permits new members to temporarily use a non-compliant venue.  Dkt. # 50-2, at 1; Dkt. # 50-4, at 6-7.

[12]    It is unclear to whom Dr. Kern sent this email.  See Dkt. # 50-11, at 1.

among others, to his response.  Id.  In response, Spera sent an email to Dr. Kern, explaining that "the league has not accepted [Hicks] Park as a stadium setting  . . ." and describing a stadium setting as possessing the following attributes:

- Professional looking building like structure with seating[.]
- Professional press box that sits a top of the seating/building. The press box overlooks the field and provides and [sic] elevated vantage point for media/reporters to view the game and to provide streaming.
- Scoreboard that is a structure that is elevated over the field.
- Sound system/ WiFi / Electricity for streaming equipment and announcing, with speakers attached to the venue.
- Typically, stadiums are enclosed by a fence or structure that is not see through or could be hopped over.  Fans are inside the stadium to view the game.

Id. (dashes transcribed as bullet points).  As the NPSL did not approve Athletic Field for the 2022 playoffs, plaintiff played the remainder of its playoff games at a local middle school.[13]  Dkt. # 51-1, at 3-4.  In late 2022 at the NSPL's annual owners' meeting, Dr. Kern once again discussed the venue issue with Spera, and Spera informed Dr. Kern that Athletic Field "would never be approved."  Dkt. # 50-4, at 11; Dkt. # 50-13, at 2.

In 2023, the NPSL published a change-of-venue form containing the following minimum venue standards:

- Closed stadium (not an open park or a park with temporary enclosures)*
- Seating for five hundred (500) people*
- Field size measuring a minimum of 65 yards x 110 yards and a maximum of 80 yards x 120 yards*
- Locker room for visiting team*
- Showers onsite for visiting team*
- Referee locker room/changing area (proper indoor space, not an outside tent/shed/storage fixture; space must not require officials to walk through teams' locker rooms)*

---

[13]    Dalesandro avers that plaintiff playing its games at the local middle school resulted in decreased attendance and lost revenue.  Dkt. # 51-1, at 3.

- Accessible [p]ress [b]ox with power outlets and shelter from rain*
- WiFi access in [p]ress [b]ox*
- Stadium lights*
- Electronic scoreboard and working time clock*
- Ample sideline space for team benches[.]*

Dkt. # 51-5, at 3.  In February 2023, plaintiff submitted a change-of-venue form seeking approval of "Tulsa Athletic Stadium"—a new name that plaintiff used to refer to Athletic Field.  Dkt. # 50, at 12; Dkt. # 50-15, at 2-3; Dkt. # 56, at 12.  On February 22, 2023 in response to plaintiff's submission, Spera emailed Dr. Kern seeking clarification as to whether Tulsa Athletic Stadium was "a different location or if you just changed the name on the submission."  Dkt. # 50-16, at 2.  The next day, Dr. Kern replied that "[t]his is the same location . . . ."  Dkt. # 50-16, at 1.  Spera responded that "[t]his is not an approved venue for 2023. We sent notification of that to you back in July 2022[;] we also talked about it in person in NYC."  Id. at 1.

On March 3, 2023,  Dr. Kern emailed Kenneth Farrell, an NPSL board member, regarding the venue issue, claiming that "[t]here has been no communication about any aspect of our venue that does not meet minimum standards[.]"  Id.; Dkt. # 65, at 15.  Farrell responded that, "[a]s communicated in July 2022[,] this is not an approved venue for the NPSL."  Dkt. # 65, at 15.  Farrell advised Dr. Kern that "[t]he league has made a decision; and its [sic] best to move on and submit an alternative field for approval."  Id. at 14.

On March 22 and 25, 2023, Spera asked Dr. Kern to submit a new venue for approval.  Id. at 13-14.  On March 26, 2023, Dr. Kern responded to Spera, informing her that they "made the decision to formally appeal the league ruling on the denial of venue for Tulsa Athletic Stadium at Hicks Park."  Id. at 13.

As the NPSL did not approve Athletic Field for the 2023 season, plaintiff played its games at a university in Claremore, Oklahoma, a 30-minute drive from Athletic Field.  Dkt. # 51-1, at 5. For the 2023 season, Tulsa Recycles sponsored plaintiff for $15,000.[14] Dkt. # 50-20, at 1.  However, plaintiff's Anheuser-Busch sponsorship did not continue after the 2022 season.[15]  Dkt. # 56-2, at 3.

On March 27, 2023, the NPSL director of officials and health and safety emailed Spera and reported that, when he visited and photographed Athletic Field several months earlier on July 31, 2022, his "most significant concern with th[e] venue [wa]s the quality of the playing surface."  Dkt. # 50-6, at 12; Dkt. # 51-10, at 2.  In April 2023, plaintiff upgraded the playing surface and improved the press box at Athletic Field.[16]  Dkt. # 50, at 12; Dkt. # 50-13, at 3-5; Dkt. # 50-14, at 4; Dkt. # 56, at 11.

At some point during 2023, plaintiff played U.S. Open Cup round one and two games (not a part of the NPSL 2023 season).  Dkt. # 55-15, at 1.  With the opposing team's permission, plaintiff hosted the second round game at Athletic Field.  Id.  On April 7, 2023, a U.S. Soccer (an organization separate from NPSL) representative informed Dr. Kern, Dalesandro, and another of plaintiff's representatives that plaintiff's venue did not meet U.S. Soccer standards, and, thus, plaintiff could not host a U.S. Open Cup third round match, because of the venue's field quality, the

---

[14]    The Tulsa Recycles invoice is dated March 7, 2023.  Dkt. # 50-20.

[15]    While Dr. Kern testified that Anheuser-Busch sponsored plaintiff in 2022 and 2023 (Dkt. # 56-2, at 3 ), he later testified that the Anheuser-Busch sponsored only the 2022 season  (Dkt. # 50-13, at 5).  Further, plaintiff admits the Anheuser-Busch sponsored only plaintiff's 2022 season.  Dkt. # 56, at 14.  Therefore, it is undisputed that Anheuser-Busch sponsored plaintiff in 2022 only.

[16]    Plaintiff maintains that its venue complied with NPSL requirements prior to these improvements.  Dkt. # 56, at 11-12.

"challenges with players needing to use a locker room outside of the enclosed perimeter[,]" and the lack of visual enclosure to the stadium.[17]  Dkt. # 55-15, at 1.

On April 21, 2023, Dr. Kern once again emailed an NPSL representative—an NPSL attorney—regarding the venue standards, and the attorney replied that "Tulsa needs to find another venue that checks all the minimum standards."  Dkt. # 51-9, at 2.  Five days after this email exchange, plaintiff entered into a license agreement with the City of Tulsa to use "Hicks Ballfield," in other words Athletic Field, to "establish[] and maintain[] the soccer fields and conduct[] soccer practices, games[,] tournaments[,] and associated activities."  Dkt. # 50-18, at 1, 15.

On May 23, 2023, plaintiff "formally appeal[ed] the decision made by the NPSL and managing director, Cindy Spera, to not approve the home venue (Tulsa Athletic Community Stadium at Hicks Park) for [its] home matches . . . ."  Dkt. # 51-7, at 2.  In the appeal, plaintiff included

---

[17]    Delesandro avers that U.S. Soccer "approved Athletic Field to host games as part of the 2023 U.S. Open Cup, including that it met the USSF's published 'enclosed stadium' requirement."  Dkt. # 51-1, at 4.  However, in the U.S. Soccer representative's email to Delesandro, Dr. Kern, and another of plaintiff's representatives, the U.S. Soccer representative stated that:

> I apologize that I didn't reach out specifically regarding this issue ahead of the draw and responded to your home game application that Hicks wouldn't be suitable for the [t]hird [r]ound. In my mind I thought that the fact we required the visiting team to agree to play at Hicks for the [s]econd [r]ound was a clear indication that we felt the venue didn't meet standards.

Dkt. # 55-15, at 1.  While the U.S. Soccer representative did not expressly state that U.S. Soccer did not approve of plaintiff's venue for round one and two games, the "U.S. Open Cup Stadium Requirements" apply to "all open cup matches from round 1 to the [f]inal . . . ."  Dkt.# 51-6, at 6-7.  Therefore, the objective evidence contradicts Delesandro's self-serving declaration, and no reasonable juror could infer that U.S. Soccer found that Athletic Field met its standards.  See Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991) ("[S]elf-serving affidavits are not sufficient . . ." to create genuine disputes as to material facts).  Rather, the evidence shows that U.S. Soccer permitted plaintiff to host at least one U.S. Open Cup match at Athletic Field, despite Athletic Field not meeting U.S. Soccer's standards.  Dkt. # 55-15, at 1; Dkt.# 51-6, at 6-7.

documents allegedly showing that the following individuals found that plaintiff's venue met NPSL standards: the Oklahoma Soccer Association executive director; the U.S. Open Cup match commissioner for the second round game that plaintiff hosted; the vice president of technical operations of FC Tulsa—plaintiff's second round U.S. Open Cup opponent; every member of plaintiff's NPSL conference; and the Women's Premier Soccer League ("WSPL") vice president of operations.[18]  Dkt. # 51, at 9; Dkt. # 51-7, at 3, 7-11.  Ultimately, plaintiff won the 2023 NPSL National Championships and, therefore, qualified to host the Steinbrecher Cup.  Dkt. # 51, at 12; Dkt. # 51-1, at 5-6; Dkt. # 55, at 12.

Prior to the 2024 season, plaintiff once again sought approval of its venue.  See Dkt. # 51-12, at 2.  Defendants' change-of-venue form listed the following minimum standards for 2024 venues:

**Venue Requirements**

- Stadium setting in a closed environment -- parks or open fields not permitted. Accessibility to the venue through one entrance point.*
- Adequate field barriers in place – spectators must not have access to the field of play*
- Ample sideline space for team benches and referee table*
- Stadium seating for five hundred (500) people.  Stadium seating must be safe, in good condition, and properly secured in a permanent position*
- Field size measuring a minimum of 65 yards x 110 yards and a maximum of 80 yards x 120 yards*
- Electronic scoreboard with clock in a permanent position overlooking the field of play*
- Field lights with adequate coverage of full field, available for full game and delays*
- Flagpole and American [f]lag, visible from field and spectator seating*
- Locker room for visiting team with private bathrooms that are not shared with spectators
- Showers for visiting team*

---

[18]    On that same day, the WPSL vice president of operations approved Athletic Field for WPSL matches and described it as a "soccer stadium."  Dkt. # 51-8, at 6.

- Referee locker room/changing area in proper indoor space.  Space must not require officials to walk through the team locker rooms.  Storage containers, tents, sheds or nonpermanent structures are not permitted.*

**Press Box Requirements**

- Permanent structure situated on top of the stands overlooking the field, suitable for streaming (storage containers, tents, sheds or non-permanent structures are not permitted)
- Shelter from wind and rain
- Power outlets
- Wifi access or working hotspot
- PA system available for National Anthem and player introductions[.]

Dkt. # 51-11, at 3 (emphasis and punctuation inconsistencies in original).  On March 6, 2024, the NPSL responded to plaintiff's change-of-venue form, denying plaintiff's request to play NPSL home games at Athletic Field.  Dkt. # 51-12, at 2. Neither Tulsa Recycles nor Anheuser-Busch sponsored plaintiff's 2024 season, which plaintiff attributes to its inability to play at Tulsa Athletic Field.[19] Dkt. # 50, at 13; Dkt. # 56, at 14-15.

On April 1, 2024, plaintiff filed a complaint in state court, seeking injunctive, declaratory, and monetary relief.  Dkt. # 2-1, at 21-23, 39, 41.  In plaintiff's complaint, it purports to raise the following "causes of action" against defendants: breach of contract; breach of the implied covenant of good faith and fair dealing; promissory estoppel; breach of fiduciary duties; tortious interference with business and contractual relationships; tortious interference with prospective economic

---

[19]     While plaintiff did not have an agreement with Anheuser-Busch after the 2022 season or Tulsa Recycles after the 2023 season, plaintiff expected sponsorships from Anheuser-Busch for the 2023 season based on its relationship with the sponsor, and from Tulsa Recycles for the 2024 season based on its previous sponsorship of plaintiff.  Dkt. # 50, at 13-14; Dkt. # 50-13, at 5, 9-10, 11; Dkt. # 56, at 14-15.  Plaintiff attributes the decrease in sponsorships to NPSL's refusal to allow plaintiff to play games at Athletic Field. Dkt. # 56, at 14-15; Dkt. # 56-2, at 3.  Plaintiff cites to no objective evidence to support its expectations as to these sponsorships.

advantage; and declaratory judgment.  Dkt. # 2-1, at 23, 25, 29, 31, 35, 37, 39.  On April 29, 2024, the NPSL removed this case to the Northern District of Oklahoma.  Dkt. # 2.

On April 30, 2024, plaintiff filed a motion for preliminary injunction.  Dkt. # 8.  On May 9, 2024, the Court held a status conference during which both sides expressed interest in resolving the case without further judicial intervention. Dkt. # 18; Dkt. # 33, at 5.  However, on May 17, 2024, the NPSL suspended plaintiff for the 2024 season.  Dkt. # 51-13, at 2.  On May 22, 2024, some of plaintiff's players informed Dalesandro that they received an email from the NPSL.  Dkt. # 51-1, at 6.  This email stated:

> Dear NPSL Player,
>
> Thank you for your dedication and your interest in playing in the [NPSL].  Due to recent developments with your current team, the league would like to help you connect with other NPSL teams, if that is something that interests you. If so, please fill out the interest form using THIS LINK. Please do not forward this link to anyone else as it is unique for you.
>
> Ultimately, it is the new team's decision to decide if they want to offer you a roster spot, but the league will try to assist you with the process as much as possible.

Dkt. # 51-15, at 2.  Dalesandro avers that this email did not result in any players leaving plaintiff's team.  Dkt. # 51-1, at 6.  On May 25, 2024, John Motta, the president of the Adult Council of U.S. Soccer (USASA), informed Dalesandro that: the USASA executive director, Bruce Bode, contacted the NPSL; the NPSL informed him that plaintiff was in bad standing; and the Steinbrecher Cup was postponed.  Dkt. # 51-14, at 2; Dkt. # 55-3, at 14.

In June 2024, defendants responded (Dkt. # 29) and plaintiff replied (Dkt. # 30) to plaintiff's motion for preliminary injunction. On July 29, 2024, the Court entered an opinion and order denying plaintiff's motion for preliminary injunction.  Dkt. # 33, at 18.  The Court held that, while plaintiff

13

made a substantial showing that it would be irreparably harmed absent the issuance of a preliminary injunction, the risk of harm to the public and the balance of the interests were neutral and plaintiff failed to show that it was likely to succeed on the merits. Id. at 16-18. The Court found, inter alia, that it was unnecessary to consider whether Athletic Field met the NPSL's venue requirements, because bylaws § 3.01, on which plaintiff relied, was simply too vague to form the basis for a contract between the parties. Id. at 15-16. The Court declined to consider whether plaintiff was likely to succeed on any other claim, because the issue had not been adequately briefed by the parties. Id. at 16-17. The Court also found that Delaware law applies to plaintiff's breach of contract claim arising under the NPSL bylaws. Id. at 14.

Plaintiff withdrew its NPSL membership on July 31, 2024, and plaintiff has agreed to help found a new league. Dkt. # 51, at 12; Dkt. # 55, at 13. On September 17, 2024, defendants filed a motion for judgment on the pleadings (Dkt. # 34). Plaintiff responded (Dkt. # 40), and defendants replied (Dkt. # 44). On February 19, 2025, defendants filed a motion for summary judgment (Dkt. # 50), and plaintiff filed a motion for partial summary judgment (Dkt. # 51). On March 12, 2025, defendants filed a response (Dkt. # 55) to plaintiff's motion, and plaintiff filed a response (Dkt. # 56) to defendants' motion. On March 26, 2025, plaintiff filed a reply (Dkt. # 60) to defendants' motion, and defendants filed a reply (Dkt. # 63) to plaintiff's motion. On March 27, 2025, defendants filed an errata/correction (Dkt. # 64) to their response in opposition to plaintiff's motion for partial summary judgment and an errata/correction (Dkt. # 65) to their motion for summary judgment. Defendants also filed a motion in limine (Dkt. # 68) and objections to plaintiff's deposition designations as to Spera (Dkt. # 67) and Farrell (Dkt. # 68).

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 323.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted).  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment.  Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff."  Anderson, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  "A motion for partial summary judgment is resolved under the same standard as a motion for summary judgment."  Doshay v. Glob. Credit

Collection Corp., 796 F. Supp. 2d 1301, 1303 (D. Colo. 2011) (citing Franklin v. Thompson, 981

F.2d 1168, 1169 (10th Cir. 1992)).

### III.

Defendants request that the Court grant them summary judgment as to all of plaintiff's claims

(Dkt. # 50), and plaintiff requests that the Court grant it summary judgment as to its breach of

contract and promissory estoppel claims (Dkt. # 51). "[C]ross-motions for summary judgment are

to be treated separately; denial of one does not require the grant of the other." Buell Cabinet Co. v.

Sudduth, 608 F.2d 431, 433 (10th Cir. 1979). However, "[t]he relevant legal standard does not

change where the parties file cross motions for summary judgment." Spirit Bank Corp. v. Warner

Aviation, Ltd., No. 11-CV-81, 2012 WL 314201, at *4 (N.D. Okla. Feb. 1, 2012). Further, "'[i]f the

granting of one motion requires the denial of the other, the court need not delve into the other motion

separately.'" Grasso-Herlan v. Kijakazi, No. 20-CV-352-JFH-JFJ, 2021 WL 11669922, at *6 (N.D.

Okla. Aug. 16, 2021) (citing Baker v. Brown, 479 F. Supp. 3d 1182, 1189 (W.D. Okla. 2020)

(reversed in part on other grounds)), r. & r. adopted by Grasso-Herlan v. Kijakazi, No.

20-CV-352-JFH-JFJ, Order (N.D. Okla. Aug. 25, 2023) (unpublished). Rather, "[t]o the extent the

cross-motions overlap[,] . . . the [C]ourt may address the legal arguments together." Id. Therefore,

the Court will simultaneously consider the legal arguments in defendants' motion for summary

judgment and plaintiff's motion for partial summary judgment.

Further, the Court notes that the parties did not brief the choice of law issue as to each claim,

and the parties apply both Oklahoma and Delaware law in their briefs. As demonstrated by the

Court's analysis below, the choice of law does not materially affect the Court's rulings as to

plaintiff's claims. Therefore, while the Court previously ruled that Delaware law applies to

plaintiff's breach of contract claim (Dkt. # 33, at 14), the Court will apply both Oklahoma and Delaware law to each of plaintiff's claims.

### A. Breach of contract

Plaintiff and defendants seek summary judgment in their respective favor on plaintiff's breach of contract claim. In light of the Court's opinion and order denying plaintiff's motion for preliminary injunction, plaintiff now appears to advance two theories as to its breach of contract claim. First, plaintiff appears to expand upon its original theory by arguing, in effect, that the 2013 policies, which include venue standards, incorporated themselves into the 2021 bylaws, and, thus, defendants' failure to approve Athletic Field, which allegedly met the 2013 standards, violated the bylaws.[20]  Dkt. # 2-1, at 23-25; Dkt. # 60, at 5-6.  Second, plaintiff newly argues that the 2013 policies—a document plaintiff claims it was unaware of until the NPSL produced it in discovery after preliminary injunction briefing—clearly establishes that the venue standards exist as contractual obligations between the NPSL and its member clubs.  Dkt. # 51, at 16 n.10; Dkt. # 56, at 18-19. Therefore, plaintiff argues that the newly discovered 2013 policies or, if the 2013 policies are no longer current, the 2023 change-of-venue form standards constitute a separate and enforceable contract that defendants violated by failing to approve Athletic Field. Dkt. # 56, at 18-19; Dkt. # 60, at 6-7.

The Court will consider both of plaintiff's theories in turn. To prevail on a breach of a contract claim, plaintiff must show that: the parties formed a contract; defendants breached the contract; and plaintiff suffered damages as a result of the breach.  Linn v. Oklahoma Farm Bureau

---

[20]    The Court, however, notes that it could fairly read plaintiff's briefing as abandoning its argument that defendants violated the 2021 bylaws.

Mut. Ins. Co., 479 P.3d 1013, 1022-23 (Okla. Civ. App. 2020); Connelly v. State Farm Mut. Auto.

Ins. Co., 135 A.3d 1271, 1279 n.28 (Del. 2016). "[A] valid contract exists when (1) the parties

intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and

(3) the parties exchange legal consideration." Eagle Force Holdings, LLC v. Campbell, 187 A.3d

1209, 1212-13 (Del. 2018). The terms of a contract must be sufficiently concrete that a reviewing

court can determine what the parties agreed to and if a breach occurred. Id. at 1232; Dunn v. Dunn,

391 P.2d 885, 887 (Okla. 1964).

### 1. Bylaws

The Court first considers plaintiff's bylaws-based breach of contract theory. Plaintiff argues

that the production of the 2013 policies, which set out minimum venue standards, rectified "[t]he

vagueness in the record . . ." that led the Court to deny plaintiff's motion for preliminary injunction,

because the 2013 policies state that they "exist in conjunction with the [b]ylaws . . ." and, thus,

"*expressly* connect the [b]ylaws and the [p]olicies . . . ." Dkt. # 56, at 18-19; Dkt. # 60, at 5-6

(emphasis in original). The Court construes plaintiff's argument as asserting that the 2021 bylaws

incorporate the 2013 policies. Defendants argue that § 3.01 remains "too vague to form the basis

for a contract between the parties[,]" and the 2021 bylaws do not incorporate the 2013 policies. Dkt.

# 50, at 15-17 (quoting Dkt. # 33, at 15-16); Dkt. # 63, at 5-6.

Under Oklahoma or Delaware law, bylaws can give rise to a contractual obligation between

members of an organization that can form the basis for a breach of contract claim. See Strougo v.

Hollander, 111 A.3d 590, 597-98 (Del. Ch. 2015); State ex rel. Oklahoma Bar Assoc. v. Gasaway,

863 P.2d 1189, 1193-94 (Okla. 1993). Bylaws are interpreted using ordinary principles of contract

interpretation. BlackRock Credit Allocation Income Tr. v. Saba Cap. Master Fund, Ltd., 224 A.3d

964, 977 (Del. 2020).  A contract may incorporate other documents or agreements by reference if it "refers to another instrument and makes conditions of such other instrument a part of it." <u>Town of Cheswold v. Cent. Delaware Bus. Park</u>, 188 A.3d 810, 818 (Del. 2018); <u>Walker v. Builddirect.Com. Techs. Inc.</u>, 349 P.3d 549, 554 (Okla. 2015) ("Under the Oklahoma law of contracts, parties may incorporate by reference separate writings, or portions thereof, together into one agreement where (1) the underlying contract makes clear reference to the extrinsic document, (2) the identity and location of the extrinsic document may be ascertained beyond doubt, and (3) the parties to the agreement had knowledge of and assented to its incorporation.").  However, "a mere reference in one agreement to another agreement, without more, does not incorporate the latter agreement into the former by reference." <u>Town of Cheswold</u>, 188 A.3d at 819 (alternations in the original omitted); <u>Walker</u>, 349 P.3d at 554.

In the Court's opinion and order denying plaintiff's motion for preliminary injunction, the Court found that bylaws § 3.01, which described the NPSL managing director's duties and powers, was simply too vague to form the basis for a contract between the parties and did not create a specific rule that was capable of easy or direct enforcement.  Dkt. # 33, at 12, 15-16.  Therefore, the Court concluded that plaintiff's theory in support of its breach of contract claim would simply turn into an inquiry concerning whether the NPSL acted in bad faith when enforcing some rule, other than the bylaws actually creating the alleged contract.  <u>Id.</u> at 16.  Consequently, the Court found that this standard was not sufficiently concrete to allow for judicial enforcement of an alleged contract between the parties.  <u>Id.</u>

Applying the same reasoning as above, the Court finds that plaintiff's bylaws-based breach of contract claim fails as a matter of law.  The 2021 NPSL bylaws do not refer to and, thus, do not

incorporate by reference the 2013 policies. Rather, the bylaws merely make general references to the policies of the NPSL. See e.g., Dkt. # 50-7, at 3, 6, 7, 13, 21. Further, the 2013 policies cannot incorporate themselves into the bylaws. Therefore, the production of the 2013 policies does not alter the Court's finding that bylaws § 3.01 is too vague to form the basis of a breach of contract claim, and plaintiff's bylaws-based breach of contract theory fails.

### 2. 2013 policies and 2023 change-of-venue form

The Court now turns to plaintiff's theory that the 2013 policies, or the 2023 change-of-venue form, act as their own separate and enforceable contract. Plaintiff argues that the newly discovered policies are equally important and enforceable as the bylaws because a voluntary association's rules, even if not specifically stated in a bylaw, are still enforceable as contract terms, and the 2013 policies exist in conjunction with the bylaws. Dkt. # 51, at 16; Dkt. # 56, at 18-19; Dkt. # 60, at 5-6. Defendants argue that the 2013 policies are not independently enforceable, and "[a]ny alleged infringement upon [p]laintiff's rights must result from a violation of the NPSL current [b]ylaws (i.e., not bylaws in effect in 2013 that have long since been superseded)." Dkt. # 55, at 15-16. Plaintiff acknowledges that the 2013 policies may be out-of-date. Dkt. # 60, at 6-7. However, plaintiff complains that, in response to its request for production, the NPSL stated that it would produce a copy of the active league policies, but produced only the 2013 policies. Id. at 6. Therefore, plaintiff concludes that "either the 2013 [p]olicies are still in effect because an updated version was not

produced, or the venue requirements cited by [plaintiff] in its [complaint (the 2023 change-of-venue form standards)] are the current version . . . .["21] Id. at 6-7.

Plaintiff advances this argument only after the Court denied its motion for preliminary injunction, finding that bylaws § 3.01 was too vague to be judicially enforceable.  Dkt. # 33, at 15-16. The Court explained that plaintiff must cite legal authority establishing the existence of a contract and a specific term of the contract that has been breached by defendants.  Id. at 16.  Instead, plaintiff asks the Court to rule in its favor on its breach of contract claim, while admitting that plaintiff is unsure whether its claim arises out of the policies or the 2023 change-of-venue form.  According to plaintiff, the Court must either accept that: the 2013 policies are current through 2024, despite the policy stating on its face that it is current through 2016 (Dkt. # 51-2, at 2); or the 2023 change-of-venue form standards applied to its venue in 2022 through 2024 (Dkt. # 51-11, at 3).  While defendants should have produced the current NPSL policies, plaintiff did not file a motion to compel the production of the current league policies under FED. R. CIV. P. 37(a)(3)(B)(iv), or a FED. R. CIV. P. 56(d) affidavit showing that it required additional discovery to respond to defendants' motion for summary judgment.  Instead, plaintiff raised this issue only in its reply to defendants' response to plaintiff's partial motion for summary judgment.

As plaintiff is unable to identify the venue requirements that it alleges defendants were contractually obligated to apply to its venue in 2022, 2023, and 2024, the Court cannot determine what the parties agreed to or whether a breach occurred.  Further, the Court questions how plaintiff

---

[21]   Plaintiff asserts that the NPSL admitted that the 2023 change-of-venue form standards are current.  Id. at 6-7.  Plaintiff does not cite to any evidence to support this allegation.  Rather, plaintiff refers to the NPSL's answer to plaintiff's complaint in which the NPSL admitted that "it has minimum venue requirements, including those [listed in plaintiff's complaint]."  Dkt. # 19, at 6, 7.

could have manifested its mutual assent to the 2013 policies if it did not know that they existed. Clouser v. Marie, No. 89, 2022, 2022 WL 5069525, at *2 (Del. 2022) ("In general, 'the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration.'") (quoting Eagle Force Holdings, LLC, 187 A.3d at 1212) (alterations in original omitted)); Hartford Ins. Grp. v. McDaniel, 526 P.2d 941, 942-43 (Okla. 1974).[22]  Thus, under either theory, plaintiff's breach of contract claim fails as a matter of law.[23]

**B. Breach of the implied covenant of good faith and fair dealing**

Defendants seek summary judgment in their favor as to plaintiff's claim for breach of the implied covenant of good faith and fair dealing. In plaintiff's complaint, it alleges that defendants breached the implied covenant of good faith and fair dealing implied in the NPSL bylaws by arbitrarily, capriciously, unreasonably, and in bad faith refusing to approve Athletic Field, despite it allegedly meeting defendants' venue requirements.  Dkt. # 2-1, at 25-27.  Defendants argue that plaintiff's claim is duplicative of its breach of contract claim and fails because it is not attached to a contractual duty.  Dkt. # 50, at 18-20.  Plaintiff responds that its claim is not duplicative because the bylaws do not include an express covenant of good faith and fair dealing.  Dkt. # 56, at 21-22.

---

[22]    Further, even if the 2013 policies (Dkt. #51-2) or the 2023 change-of-venue form (Dkt. # 51-5) constituted a separate and enforceable contract, neither the document nor form states that the managing director or any other NPSL representative must or shall approve venues that meet the minimum standards.

[23]    Therefore, the Court need not reach defendants' arguments that: plaintiff's claimed damages are too speculative (Dkt. # 50, at 17); or the Court should treat plaintiff's reliance on the 2013 policies as an improper request to amend (Dkt. # 63, at 6). Similarly, the Court need not reach plaintiff's arguments that the NPSL applied its venue requirements in an arbitrary and capricious manner (Dkt. # 51, at 16-18).

Plaintiff does not respond to defendants' argument that its claim fails because it is not attached to a specific contractual duty.

The Court will conduct separate analyses under Delaware and Oklahoma law because the states' legal frameworks differ with regard to this specific claim. Under Delaware law, "'[t]he implied covenant is inherent in all contracts'" to ensure that parties do not "'frustrate the fruits of the bargain' by acting 'arbitrarily or unreasonably.'" Baldwin v. New Wood Res. LLC, 283 A.3d 1099, 1116 (Del. 2022) (quoting Dieckman v. Regency GP LP, 155 A.3d 358, 367 (Del. 2017)) (alterations in the original omitted). "To sufficiently plead [a] breach of the implied covenant of good faith and fair dealing, a complaint 'must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" Id. at 1117-18 (quoting Sheehan v. AssuredPartners, Inc., No. 2019-0333-AML, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020)). While the Delaware Supreme Court "has recognized the occasional necessity of implying contract terms to ensure the parties' reasonable expectations are fulfilled[,]" implying such terms is "a rare and fact-intensive exercise, governed solely by issues of compelling fairness. Only when it is clear from the writing that the contracting parties would have agreed to proscribe the act later complained of had they thought to negotiate with respect to that matter may a party invoke the covenant's protections." Wal-Mart Stores, Inc. v. AIG Life Ins. Co., 901 A.2d 106, 116 (Del. 2006) (quoting Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005)) (alterations in original omitted). "The doctrine thus operates only in that narrow band of cases where the contract as a whole speaks sufficiently to suggest an obligation and point to a result, but does not speak directly enough to provide an explicit

answer."[24]  Lonergan v. EPE Holdings, LLC, 5 A.3d 1008, 1018 (Del. Ch. 2010) (quoting Airborne Health, Inc. v. Squid Soap, LP, 984 A.2d 126, 146 (Del. Ch. 2009)). The implied covenant is not "a backstop to imply terms that parties failed to include but which could easily have been drafted." Baldwin, 283 A.3d at 1117.

Here, the parties admit that the bylaws[25] do not include venue requirements.  Dkt. # 2-1, at 25; Dkt. # 19, at 7; Dkt. # 20, at 7.  Yet, plaintiff maintains that the bylaws constitute a contract in which the Court should imply a covenant of good faith and fair dealing as to defendants' application of these requirements.  The Court previously held, and reaffirms in this opinion and order, that NPSL bylaws § 3.01's general provision, requiring that the NPSL managing director enforce the NPSL's rules, does not amount to a contractual obligation to enforce venue standards that are not stated within the bylaws.  Dkt. # 33, at 15-16.  Therefore, plaintiff's claim fails because the contract at issue does not address venue standards and, thus, no obligation to apply those standards in a reasonable manner arises from the contract.  See Nemec v. Shrader, 991 A.2d 1120, 1127-28 (Del. 2010) (holding that the court could not imply an implied covenant of good faith and fair dealing where the contract did not address allegedly violative conduct that the parties could have anticipated).

---

[24]    Defendants cite Stewart v. BF Bolthouse Holdco, LLC, No. 08119-VCP, 2013 WL 5210220, at *16 (Del. Ch. Aug. 30, 2013), as holding that "a claim for breach of the implied covenant of . . . good faith and fair dealing that relies upon the same allegations as a breach of contract claim is duplicative of the latter . . . ." Dkt. # 50, at 18.  However, in Stewart, the Delaware Court of Chancery held that the implied covenant claim was duplicative of the breach of contract claim because the plaintiffs' claims arose out of the same express contractual provisions that required the board to act in good faith under the circumstances at issue in the case.  Stewart, 2013 WL 5210220, at *16.  As the NPSL bylaws contain no express contractual provision requiring defendants to act in good faith when determining whether a team's venue meets NPSL standards, the facts in Stewart are inapposite to the current case.

[25]    Defendants admit that the bylaws constitute a contract.  Dkt. # 50, at 23.

Further, plaintiff's claim would still fail under Oklahoma law.  Oklahoma recognizes a common law duty for parties entering a contract that "neither party . . . will act to injure the parties' reasonable expectations nor impair the rights or interests of the other to receive the benefits flowing from their contractual relationship."  First Nat'l Bank & Trust Co. of Vinita v. Kissee, 859 P.2d 502, 509 (Okla. 1993).  "In ordinary commercial contracts, a breach of that duty merely results in damages for breach of contract, not independent tort liability."  Wathor v. Mut. Assurance Adm'rs Inc., 87 P.3d 559, 561 (Okla. 2004).  Absent a special relationship between the parties, Oklahoma law does not recognize a tort claim arising out of a breach of contract, because imposing "tort liability . . . for every breach of contract would only serve to chill commercial transactions."  Rodgers v. Tecumseh Bank, 756 P.2d 1223, 1227 (Okla. 1988).  "The 'special relationship' that gives rise to tort liability for bad faith is marked by (1) a disparity in bargaining power where the weaker party has no choice of terms, also called an adhesion contract, and (2) the elimination of risk."  Embry v. Innovative Aftermarket Sys. L.P., 247 P.3d 1158, 1160 (Okla. 2010).  Oklahoma courts have created a narrow exception to this rule in cases in which there was "gross recklessness or wanton negligence on behalf of a party."  Beshara v. S. Nat'l Bank, 928 P.2d 280, 288 (Okla. 1996).

However, plaintiff cites to no evidence from which a reasonable juror could infer that: the bylaws are not an ordinary commercial contract; a special relationship exists between plaintiff and defendants; or defendants' failure to approve Athletic Field amounted to gross recklessness or wanton negligence.[26]  Therefore, plaintiff's claim for breach of the implied covenant of good faith and fair dealing fails, regardless of whether Oklahoma or Delaware law applies.

---

[26]    Therefore, the Court need not reach defendants' argument that they acted in good faith and plaintiff's claimed damages are too speculative.  Dkt. # 50, at 20-22.

### C. Promissory estoppel

Plaintiff and defendants seek summary judgment in their respective favor on plaintiff's promissory estoppel claim. In plaintiff's complaint, it alleges that, if the bylaws do not constitute a contract between the NPSL and its members, they constitute a promise that defendants will fairly apply the NPSL rules, policies, and procedures in a manner that is not arbitrary, capricious, unreasonable, or in bad faith. Dkt. # 2-1, at 29. However, plaintiff now argues that, "[i]f the NPSL [p]olicies and/or its published venue requirements are not enforceable as contract terms, they constitute a promise that if a club identifies a venue that fits within the requirements, it will be approved for use." Dkt. # 51, at 18; Dkt. # 56, at 23. Defendants argue that plaintiff's promissory estoppel claim fails because an express contract covers the same subject matter, and plaintiff did not reasonably rely on any promise of defendants. Dkt. # 50, at 22-24; Dkt. # 55, at 21-24.

To raise a promissory estoppel claim, plaintiff must show that: "(i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." Chrysler Corp. (Delaware) v. Chaplake Holdings, Ltd., 822 A.2d 1024, 1032 (Del. 2003); Russell v. Bd. of Cnty. Comm'rs, Carter Cnty., 952 P.2d 492, 503 (Okla. 1997). However, "where a fully integrated, enforceable contract governs the promise at issue[,]" promissory estoppel does not apply. SIGA Techs., Inc. v. PharmAthene, Inc., 67 A.3d 330, 348 (Del. 2013); Genencor Int'l, Inc. v. Novo Nordisk A/S, 766 A.2d 8, 12 n.6 (Del. 2000); Parsia, Inc. v. John E. Barbre Tr., 500 P.3d 667, 673 (Okla. Civ. App. 2021).

26

As with plaintiff's breach of contract claim, the Court will consider both of plaintiff's promissory estoppel theories. Originally, plaintiff premised its claim on the bylaws constituting a promise to apply NPSL rules, policies, and procedures fairly. Dkt. # 2-1, at 29. While plaintiff fails to identify a specific promise made by defendants, the Court finds that it is clear that the bylaws—a contract between the NPSL and plaintiff—would cover the same subject matter as the alleged promise under plaintiff's original theory. Thus, the Court finds that plaintiff's original theory fails as a matter of law because a contract governs the alleged promise.

However, plaintiff newly argues that "the NPSL policies and/or its published venue requirements . . ." amount to "a promise that[,] if a club identifie[s] a venue that fits within the requirements, [the NPSL] will approve [the venue] for use." Dkt. # 51, at 18. The Court finds plaintiff's argument implausible because plaintiff effectively alleges that it relied upon a promise, yet, it states that it is unsure upon which promise it supposedly relied. Plaintiff does not cite to any evidence showing who made the promise, when the promise was made, or what specifically the promise entailed. Nevertheless, the Court independently reviewed the record and identified the following documents that include venue standards: the 2013 policies (Dkt. # 51-2); the July 15, 2022, minimum venue standards for the 2022 playoffs (Dkt. ## 50-9, 51-3); the 2023 change-of-venue form (Dkt. ## 50-15, 51-5); and the 2024 change-of-venue form (Dkt. # 51-11). However, none of the documents states that, if a NPSL member's venue meets the minimum requirements, the NPSL will approve the venue. Therefore, no reasonable juror could find that plaintiff met the first element of its promissory estoppel claim because plaintiff fails to carry its burden of identifying any evidence

27

showing that defendants made a promise to plaintiff.[27]  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 672 (10th Cir. 1998) ("[W]here the burden to present such specific facts by reference to exhibits and the existing record was not adequately met below, we will not reverse a district court for failing to uncover them itself.").

Even if plaintiff had met its burden as to the first element, the Court finds that plaintiff could not have reasonably relied on any of the listed documents to its detriment and failure to enforce the purported promises would not result in injustice.  Plaintiff could not have relied on the 2013 policies because plaintiff asserts that it did not know of the document until the NPSL produced it in discovery. Dkt. # 51, at 16 n.10; Dkt. # 56, at 18.  Similarly, plaintiff could not have reasonably relied on the 2023 and 2024 change-of-venue forms because those standards were published after July 18, 2022—the date Spera informed plaintiff that the NPSL did not approve of Athletic Field as a venue because it lacked a stadium, which is a requirement under all of the possible sets of venue standards. See Dkt. # 50, at 11; Dkt. # 50-10, at 1; Dkt. # 56, at 10.  Therefore, the only venue standards that plaintiff could have relied upon is the July 15, 2022, playoffs email.  Yet, the email expressly limits its application to the 2022 playoffs, and plaintiff identifies no evidence showing that it acted to its detriment during the three day period between receiving this email and notice that the NPSL did not approve its venue.  Therefore, reliance on the July 15, 2022, email was neither reasonable nor foreseeable, and the Court finds that failing to enforce an unidentified promise would not result in injustice.  Chrysler Corp. (Delaware), 822 A.2d at 1034 ("The avoidance of injustice element is, however, a legal concept and not a question of fact to be submitted to the jury.").  Thus, plaintiff's

---

[27]    In fact, plaintiff fails to cite to any evidence in the promissory estoppel section of its motion for partial summary judgment (Dkt. # 51, at 18-19) or its response to defendants' motion for summary judgment (Dkt. # 56, at 22-23).

claim for promissory estoppel fails as a matter of law, because no reasonable juror could find that plaintiff reasonably relied on a promise by defendants to enforce unspecified venue requirements.

### D. Breach of fiduciary duties

Defendants seek summary judgment as to plaintiff's breach of fiduciary duties claim.  In plaintiff's complaint, it alleges that defendants owe fiduciary duties to the NPSL and its members, including "the duty to apply the [NPSL's] rules, policies, and procedures fairly, and to avoid making decisions that are arbitrary capricious, unreasonable, or in bad faith."  Dkt. # 2-1, at 31-33. Defendants argue that plaintiff's breach of fiduciary duties claim fails because it is duplicative of its breach of contract claim.  Dkt. # 50, at 24-25.  Plaintiff responds that it plead a claim for breach of fiduciary duties as an alternative to its breach of contract claim.  Dkt. # 56, at 23-24.  Defendants reply that, regardless of whether plaintiff plead the claims in the alternative, the breach of fiduciary duties claim fails because the alleged fiduciary duties arise out of the bylaws.  Dkt. # 63, at 8.

Fiduciary duties arise out of special relationships.  Horton v. Hamilton, 345 P.3d 357, 364 (Okla. 2015) (explaining that a fiduciary duty exists when "one person acquires influence over another such that the influenced allows the influencer to substitute his or her will for the influenced's own"); Wal-Mart Stores, Inc., 901 A.2d at 113 ("[A] fiduciary relationship is a situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect the interests of another.") (quoting Wal-Mart Stores, Inc. v. AIG Life Ins. Co., 872 A.2d 611, 624 (Del. Ch. 2005) (reversed on other grounds)).  "To establish liability for the breach of a fiduciary duty, a plaintiff must demonstrate that the defendant owed [it] a fiduciary duty and that the defendant breached it."  Est. of Eller v. Bartron, 31 A.3d 895, 897 (Del. 2011); Graves v. Johnson, 359 P.3d 1151, 1155 (Okla. Civ. App. 2015) (explaining that the elements of a breach of fiduciary duty claim

29

are "(1) the existence of a fiduciary relationship; (2) a breach of fiduciary duty; and (3) the breach of a fiduciary duty was the direct cause of damages."). "[I]t is vitally important that the exacting standards of fiduciary duties not be extended to quotidian commercial relationships . . . ." Wal-Mart Stores, Inc., 901 A.2d at 113 (quoting Wal-Mart Stores, Inc., 872 A.2d at 627-28); Quinlan v. Koch Oil Co., 25 F.3d 936, 942 (10th Cir. 1994). Further, plaintiff's breach of fiduciary duties claim must be based on facts independent from those giving rise to its breach of contract claim. See Stewart v. BF Bolthouse Holdco, LLC, No. CV 8119-VCP, 2013 WL 5210220, *12 (Del. Ch. Aug. 30, 2013) ("It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim[,]" but a narrow exception exists in cases where "the fiduciary duty claims 'depend on additional facts as well, are broader in scope, and involve different consideration in terms of a potential remedy.'") (quoting Nemec, 991 A.2d at 1129, and Grunstein v. Silva, No. 3932–VCN, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009)); Quinlan, 25 F.3d at 943; Rodgers, 756 P.2d at 1227 ("Without an independent basis to support a tortious wrongdoing, there is nothing more than an alleged breach of that contract.").

Here, plaintiff does not dispute that it raises a breach of fiduciary duties claim arising out of the NPSL bylaws. Dkt. # 56, at 23-24. Rather, it argues that, if the NPSL bylaws do not constitute a contract, they impose fiduciary duties on defendants. Id. However, the NPSL bylaws do form a contract—one which simply does not impose the contractual obligations alleged by plaintiff. Further, plaintiff fails to identify any evidence showing that its breach of fiduciary duties claim arises out of facts independent of its breach of contract claim. It is not the role of the Court to infer from the record what other facts in the record could give rise to a breach of fiduciary duties claim separate from the breach of contract claim. See Adler, 144 F.3d at 672. Therefore, plaintiff's breach of fiduciary

duties claim fails as a matter of law because plaintiff fails to present any evidence showing that such duties existed.

### E. Tortious interference claims

Defendants seek summary judgment as to plaintiff's tortious interference claims. In plaintiff's complaint, it alleges nearly identical claims for tortious inference with business and contractual relationships and tortious interference with prospective economic advantage. Dkt. # 2-1, at 35, 37. As to the tortious interference with business and contractual relationships claim, plaintiff alleges that defendants knew or should have known of its exclusive license with the City of Tulsa, its sponsorships and vendor agreements with third parties, and other vital business relationships, and defendants intentionally interfered with these relationships by unreasonably denying Athletic Field as a venue. Id. As to the claim for tortious interference with prospective economic advantage, plaintiff makes the same allegations, but additionally claims that it was pursuing sponsorship, vendor, and other agreements directly tied to the use of Athletic Field. Id. at 37.

Defendants argue that plaintiff's claims fail because: the claims are not based on a breach of a duty independent of the bylaws; plaintiff executed an agreement with the City of Tulsa after it was informed that Athletic Field was not approved; and plaintiff reduced its efforts to secure sponsors in 2023 and 2024. Dkt. # 50, at 26-27. In essence, defendants argue that plaintiff fails to show that it had an existing contractual or business right with which defendants maliciously and wrongfully interfered. Id. at 27-28. Plaintiff responds that it "specifically alleged that the [NPSL's] decision making concerning Athletic Field was not only contrary to the published venue requirements but w[as] based on personal animus with tortious intent to cause harm to [plaintiff] and its owners." Dkt. # 56, at 25. Plaintiff additionally argues that the NPSL's "conduct *subsequent* to the filing of [this

action] form additional bases for these claim[s] . . . ." Id. (emphasis in original). Plaintiff concludes that, as "[t]he premise of th[e]s[e] claim[s] is dependent almost entirely on facts . . . [,]" the Court cannot dispose of the claims on summary judgment. Id. at 25-26.

"Although [tortious interference claims] as [they] relate[] to current/present business relations and prospective business relations are extremely similar, they are recognized as distinct torts." Loven v. Church Mut. Ins. Co., 452 P.3d 418, 425 (Okla. 2019). Therefore, while the parties address plaintiff's tortious interference claims simultaneously, the Court will consider each claim in turn.

### 1. Tortious interference with business and contractual relationships

The elements of a tortious interference with business and contractual relationships claim are similar under Oklahoma and Delaware law. Under Oklahoma law, plaintiff must present evidence to show that:

> (1) the interference was with an existing contractual or business right;
> (2) such interference was malicious and wrongful;
> (3) the interference was neither justified, privileged nor excusable; and
> (4) the interference proximately caused damage.

Wilspec Techs., Inc. v. DunAn Holding Grp., Co., 204 P.3d 69, 75 (Okla. 2009). The intentional interference element of the claim requires a finding of bad faith on the part of the interferor. Loven, 452 P.3d at 425. "The element of malice, for malicious interference, is defined as an unreasonable and wrongful act done intentionally, without just cause or excuse." Tuffy's, Inc. v. City of Oklahoma City, 212 P.3d 1158, 1165 (Okla. 2009). Explaining the parameters of a privileged interference, the Oklahoma Supreme Court has held that "it is not unlawful for one to 'interfere with the contractual relations of another if this is done by fair means, if it is accompanied by honest intent, and if it is done to better one's own business and not to principally harm another.'" Morrow Dev. Corp. v. Am. Bank

& Tr. Co., 875 P.2d 411, 416 n.21 (Okla. 1994) (alterations in original omitted) (quoting Del States Bank v. Salmon, 548 P.2d 1024, 1027 (Okla. 1976)).  A tortious interference claim cannot be asserted against a person who was a party to the contractual or business relationship that was allegedly interfered with, and such a claim is cognizable only against a third party to the contract or business relationship.  Wilspec Techs., Inc., 204 P.3d at 74.

Here, plaintiff's claim arises out of defendants' allegedly improper denial of Athletic Field as a venue. Beginning on July 18, 2022, and ending on March 6, 2024, the NPSL, through its representatives, communicated on seven separate occasions that Athletic Field was not an approved venue because it lacked a stadium. Dkt. # 50-10; Dkt. # 50-11; Dkt, # 50-13, at 2; Dkt. # 50-16; Dkt. # 51-9, at 2; Dkt. # 51-12; Dkt. # 65, at 14.  Nearly two years after defendants' initial rejection of Athletic Field, the following events occurred: on May 17, 2024, the NPSL suspended plaintiff (Dkt. # 51-13, at 2); on May 22, 2024, some of plaintiff's players told plaintiff that the NPSL sent an email to plaintiff's players offering to connect them with other NPSL teams (Dkt. # 51-1, at 6; Dkt. # 51-15, at 2); and, on May 25, 2024, the USASA president informed plaintiff that a USASA representative reached out to the NPSL, and the NPSL informed the representative that plaintiff was in bad standing with the NPSL (Dkt. # 51-14, at 2; Dkt. # 55-3, at 14).  While plaintiff fails to clearly articulate the basis for its claim, the Court infers that plaintiff argues that defendants' conduct—refusing to approve Athletic Field as a venue, suspending plaintiff, emailing plaintiff's players, and informing the USASA representative of plaintiff's bad standing—amounts to unlawful interference with plaintiff's 2022 season Anheuser Busch sponsorship (Dkt. # 50-21), 2023 season Tulsa Recycles sponsorship (Dkt. # 50-20), and City of Tulsa license executed on April 26, 2023, (Dkt. # 50-18).  Dkt. # 2-1, at 35-37; Dkt. # 56, at 24-25.

Here, plaintiff produced documents signed by third parties allegedly finding that the stadium met the NPSL's requirements. Dkt. # 51-7, at 3, 7-11. This evidence could support an inference that defendants' decision was unreasonable. However, the bylaws do not include venue requirements, and defendants had no obligation to approve Athletic Field as a venue. Without further evidence of malicious and wrongful conduct, no reasonable juror could conclude that defendants' continued and consistent denial of Athletic Field as a venue and resulting suspension of plaintiff, communication to the players, and honest response to the USASA's inquiry were wrongful as a matter of law. Further, plaintiff cites to no evidence showing that defendants acted with any intent to interfere with plaintiff's contracts or business relationships. Rather, the Court finds that the record shows that plaintiff repeatedly ignored defendants' decision not to approve Athletic Field because plaintiff believed defendants' decision was unfair, and plaintiff now wishes to sue defendants for the consequences of plaintiff's own actions. On this basis alone, the Court could find that plaintiff's claim fails simply because plaintiff presents no evidence of malicious or wrongful intent. See Mac Adjustment, Inc. v. Prop. Loss Rsch. Bureau, 595 P.2d 427, 429-430 (Okla. 1979) (finding that the trial court should have sustained the defendant's motion for directed verdict on the plaintiff's malicious interference with contract or business relations claim because, inter alia, plaintiff presented no evidence of malicious or wrongful intent).

Nevertheless, the Court will consider whether the four purported unlawful interferences could form the basis of a tortious interference with contractual or business relations claim.

### i. Defendants' refusal to approve Athletic Field as a venue

On July 18, 2022, Spera informed Dr. Kern that the NPSL did not approve Athletic Field as a venue. Dkt. # 50-10. At that time, plaintiff's only contract allegedly interfered with was the 2022

34

season Anheuser-Busch sponsorship. Dkt. # 50-21. However, no objective evidence in the record shows defendants' denial of Athletic Field impacted the sponsorship agreement. Further, as plaintiff executed the Tulsa Recycles sponsorship and the City of Tulsa license after it had notice that defendants did not approve of Athletic Field, defendants' later denials of Athletic Field as a venue cannot constitute intentional interference with those contracts. Therefore, defendants' denial of Athletic Field as a venue cannot form the basis of this claim.

ii. The NPSL's suspension of plaintiff

The NPSL suspended plaintiff on May 17, 2024. Dkt. # 51-13, at 2. Plaintiff's only contract at that time allegedly interfered with was the City of Tulsa license. Dkt. # 50-18, at 2, 15. Plaintiff executed the license over a-year-and-a-half after Spera communicated the NPSL's decision not to approve Athletic Field as a venue (Dkt. # 50-10), and, during that year-and-a-half, the NPSL, through its representatives, communicated their unwavering denial. All communications among the parties prior to plaintiff's suspension concerned approval of Athletic Field. See generally Dkt. # 50-10; Dkt. # 50-11; Dkt. # 50-13, at 2; Dkt. # 50-16; Dkt. # 51-12; Dkt. # 65, at 14. Plaintiff cites to no evidence explicitly stating the reason for its suspension. Therefore, based on the summary judgment record, the only basis for plaintiff's suspension was plaintiff's long-term failure to secure a compliant venue. As a result, the NPSL's suspension of plaintiff was its own contractual right, was privileged and not malicious or wrongful, thereby negating elements of a tortious interference claim.

iii. The NPSL's email to plaintiff's players

Plaintiff admits that the NPSL's email (Dkt. # 51-15, at 2) did not cause any players to leave its team. Dkt. # 51-1, at 6. Further, plaintiff fails to cite to any evidence that this email interfered

with any existing business or contract right.  Thus, the NPSL email cannot form the basis of this claim.

           iv. The NPSL representative's response to USASA representative's inquiry

       When a USASA representative contacted the NPSL, the NPSL informed the representative that plaintiff was in bad standing.  Dkt. # 51-14, at 2.  As a result, the USASA president informed plaintiff that the Steinbrecher Cup, which plaintiff was slated to host, was postponed.  Id.; Dkt. # 51-1, at 6.  Plaintiff has produced no evidence that a contract or business right existed as to the Steinbrecher Cup.  However, assuming that a contract or business right existed, defendants' honest response to a USASA representative's inquiry—that plaintiff was not in good standing with the NPSL—does not amount to intentional interference.  See Daniels v. Union Baptist Ass'n, 55 P.3d 1012, 1016, 1017 (Okla. 2001) (holding that the trial court properly granted summary judgment in favor of two defendants where the alleged interference occurred "at the behest of third parties and those acts were not shown to have been calculated to benefit either . . ." defendant).  Therefore, defendants' honest communication with a USASA representative cannot form the basis for this claim.

       Thus, under Oklahoma law, plaintiff fails to present any evidence from which a reasonable juror could infer that defendants' intentionally interfered with plaintiff's business or contractual rights.  As plaintiff fails to provide any evidence of intentional interference, plaintiff's claim similarly fails under Delaware law.  See Bhole, Inc. v. Shore Invs., Inc., 67 A.3d 444, 453 (Del. 2013) (explaining that "the elements of a claim for tortious interference with a contract are: '(1) a contract, (2) about which defendant knew, *and* (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury[,]'" and requiring a showing of bad faith or malicious intent) (emphasis in original) (quoting Irwin & Leighton, Inc. v. W.M.

<u>Anderson Co.</u>, 532 A.2d 983, 992 (Del.Ch.1987)). Thus, the Court finds that plaintiff's claim fails as a matter of law.

### 2. Tortious interference with prospective economic advantage

The elements of a tortious interference with prospective economic advantage claim are similar under Oklahoma and Delaware law. To establish a claim for tortious interference with prospective economic advantage, plaintiff must show:

> 1.) the existence of a valid business relation or expectancy;
> 2.) knowledge of the relationship or expectance on the part of the interferer;
> 3.) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and
> 4.) resultant damage to the party whose relationship has been disrupted.

<u>Loven</u>, 452 P.3d at 425. "Courts define interference as: inducing a third person not to enter into the prospective relation or preventing the other party from acquiring the prospective relation; encompassing an unfair or unlawful act or by lawful means without justification; or intentionally acting with the purpose to interfere with the relationship or expectancy." <u>Id.</u> at 426.

Here, plaintiff appears to assert that defendants' refusal to approve Athletic Field as a venue, suspension of plaintiff, email to plaintiff's players, and communication to the USASA representative interfered with plaintiff's anticipated Anheuser-Busch and Tulsa Recycles sponsorships. Dkt. # 2-1, at 37-39; Dkt. # 56, at 24-25. However, plaintiff once again cites to no evidence from which a reasonable juror could infer that: it had a valid business relation or expectancy; that defendants were aware of any purported relations or expectancies other than in the abstract; and that these events damaged plaintiff's relationships with the sponsors. Further, as the Court explained above, the four events do not amount to intentional interference by defendants. Plaintiff simply fails to identify any evidence from which a reasonable juror could find defendants liable for tortious interference with

prospective economic advantage. For the same reasons, plaintiff's claim fails under Delaware law. See Empire Fin. Servs., Inc. v. Bank of New York (Delaware), 900 A.2d 92, 98 n.19 (Del. 2006) ("This tort requires proof of: '(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner.'"). Therefore, plaintiff's claim for tortious interference with prospective economic advantage fails as a matter of law.[28]

### F. Declaratory judgment

Plaintiff seeks a declaratory judgment determining that: (a) Athletic Field met and continues to meet the NPSL venue requirements; (b) defendants' refusal to approve Athletic Field, even though it meets all of the NPSL venue requirements, was and is arbitrary, capricious, unreasonable, and in bad faith; (c) defendants' refusal to approve Athletic Field was arbitrary, capricious, unreasonable, and in bad faith, because defendants refused to hold a hearing or appeal, provide any forum to determine the merits of the NPSL's decision to deny the use of Athletic Field, perform a site visit, work cooperatively with plaintiff to remedy any perceived deficiencies, or adequately explain defendants' decision; (d) defendants may not preclude plaintiff from playing its 2024 NPSL games at Athletic Field; and (e) defendants may not preclude plaintiff from playing future NPSL games at

---

[28]    Therefore, the Court need not address defendants' argument that plaintiff failed to amend its complaint to include allegations as to its suspension and defendants' communication with USASA and plaintiff's players. Dkt. # 63, at 8-9. Similarly, the Court does not address defendants' argument that plaintiff is unable to recover certain of its claimed damages. Dkt. # 50, at 28-31.

Athletic Field. Dkt. # 2-1, at 39. As the Court finds that all of plaintiff's above claims fail as a matter of law,[29] the Court also denies plaintiff's claim for declaratory judgment.

The Court grants defendants' motion for summary judgment (Dkt. # 50) and denies plaintiff's motion for partial summary judgment (Dkt. # 51). Further, as all of plaintiff's claims fail, the Court finds that defendants' motion for judgment on the pleadings (Dkt. # 34) is moot. See StarLink Logistics, Inc. v. ACC, LLC, 101 F.4th 431, 451 (6th Cir. 2024) ("Because [defendant's] motion for judgment on the pleadings raises almost wholly the same issues as its motion for summary judgment, our rulings render it practically entirely moot."); Lindgren v. Safeco Ins. Co. of Am., No. 20-CV-2914-WJM-KMT, 2021 WL 5957418, *6 (D. Colo. Dec. 16, 2021) (granting defendant's motion for summary judgment and, thus, denying defendant's motion for partial judgment on the pleadings as moot).

**IT IS THEREFORE ORDERED** that defendants' motion for summary judgment (Dkt. # 50) is **granted.** A separate judgment is entered herewith.

**IT IS FURTHER ORDERED** that plaintiff's partial motion for summary judgment (Dkt. # 51) is **denied.**

**IT IS FURTHER ORDERED** that defendants' motion for judgment on the pleadings (Dkt. # 34), objections to deposition designations (Dkt. ## 67, 68), and motion in limine (Dkt. # 70) are **moot.**

---

[29] The Court notes that, while plaintiff sued Spera in her individual and official capacity, there is no evidence in the record from which a reasonable juror could infer that Spera acted outside of her capacity as the NPSL's managing director. However, regardless of the capacity in which plaintiff sued Spera, the Court finds that all of plaintiff's claims fail as a matter of law on other grounds, and, thus, the Court need not address this issue.

**DATED** this 28th day of August, 2025.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE